UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERLIANT ENERGY, INC., et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>CHRISTOPHER JOHN BARRY,<br><br>    Defendant. | Case No. 14-cv-02443-JST<br><br>**ORDER ISSUING PRELIMINARY INJUNCTION; SETTING ORDER TO SHOW CAUSE** |

Plaintiffs Verliant Energy, Inc. and Verliant Sciences, LLC (collectively, "Plaintiffs") have moved for a temporary restraining order barring Defendant Christopher John Barry ("Defendant") from conducting various commercial activities, and ordering him to return intellectual and other property Plaintiffs claim to own. Plaintiffs allege that they are California citizens and that Defendant is a British citizen, see Complaint ¶¶ 3-5, ECF No. 1, giving this court jurisdiction pursuant to 28 U.S.C. § 1332(a). Plaintiffs' complaint also brings causes of action under federal law, giving this court jurisdiction pursuant to 28 U.S.C. § 1331.

The court previously issued a temporary restraining order to preserve the *status quo* while the matter could be set for hearing, notice could be provided to Defendant, and Defendant could be heard in opposition. See ECF No. 12. At the hearing, held June 11, the court heard extended argument from both parties' counsel regarding the propriety of continued injunctive relief, and also heard testimony from Defendant and from Andrew Chiu, CEO of Plaintiff Verliant Energy, Inc.

"Situations may arise where the parties, at the time of the hearing on the motion to dissolve the restraining order, find themselves in a position to present their evidence and legal arguments for or against a preliminary injunction." Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty., 415 U.S. 423, 441 (1974). "In such circumstances,

1  of course, the court can proceed with the hearing as if it were a hearing on an application for a
2  preliminary injunction." Id.  The court therefore considers Plaintiffs' motion for a temporary
3  restraining order to be effectively a request for a preliminary injunction, although as set forth more
4  fully *infra*, the court will set the matter for a later hearing on whether the preliminary injunction
5  should be lifted or modified, consistent with the approach the court discussed with the parties at
6  the hearing.

7  The same legal standard applies to a motion for a temporary restraining order and a motion
8  for a preliminary injunction.  See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832,
9  839, n. 7 (9th Cir. 2001).  A plaintiff seeking either remedy "must establish that he is likely to
10 succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary
11 relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."
12 Am. Trucking Associations, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009)
13 (quoting Winter v. Nat. Resources Defense Council, 555 U.S. 7, 20 (2008)).  Injunctive relief is
14 "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is
15 entitled to such relief." Winter, 555 U.S. at 22.

16 To grant preliminary injunctive relief, a court must find that "a certain threshold showing
17 is made on each factor." Leiva-Perez v. Holder, 640 F.3d 962, 966 (9th Cir. 2011).  Provided that
18 this has occurred, in balancing the four factors, "'serious questions going to the merits' and a
19 balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary
20 injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and
21 that the injunction is in the public interest." Planned Parenthood Arizona, Inc. v. Humble, __ F.3d
22 __, 14-15624, 2014 WL 2464983, at *5 (9th Cir. June 3, 2014) (quoting Alliance for the Wild
23 Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011)).

24 The court considers each factor in turn.

25 **I.      Success on the Merits**

26 Plaintiffs allege that Defendant has breached, and continues to be in breach of, his
27 contractual agreements with them.  See Complaint ¶¶ 64-70, 79-88.  They also allege that he has
28 misappropriated, and will continue to misappropriate, their trade secrets, in violation of

California's Uniform Trade Secrets Act ("UTSA"), Cal. Civ. Code § 3426, *et seq*.

After considering the evidence and the testimony at the hearing, the court concludes that Plaintiffs and Defendant are parties to a binding contractual employment and intellectual property agreement ("Memorandum of Terms").[1]  Exh. D to Declaration of Andrew Chiu (ECF No. 11-1, at ECF Page Nos. 42-43).  That agreement was performed at least in substantial part by Plaintiffs, who paid Defendant his agreed-upon salary monthly from June 2013 until his resignation in April 2014.

The court also concludes that the Memorandum of Terms incorporates by reference the terms of the Proprietary Information and Inventions Agreement ("PIIA"), Exh. B to Chiu Declaration (ECF No. 11-1, at ECF Page Nos. 21-25).  The Memorandum of Terms states that Defendant was "to assign all intellectual property pertaining to waste-to-energy research and technology," and was "to be governed by PIIA already signed and in effect."  Although the copy of the PIIA submitted to the court is itself signed only by Defendant and not by a representative of Plaintiffs, the court concludes that the only reasonable interpretation of the Memorandum of Terms is that it incorporated the terms of the PIIA.  Otherwise, the parties would have been purposefully including a term they knew to have no effect.

Under the PIIA, Defendant agreed to regard as Plaintiffs' sole property any "Proprietary Information," which it defined as "information that has been created, discovered, developed or otherwise become known to the Company . . . and/or in which property rights have been assigned or otherwise conveyed to the Company, which information has commercial value in the business in which the Company is engaged."  This specifically included any "trade secrets," "data," and "test results."

In the PIIA, Defendant also assigned certain intellectual property to Defendant.  While it is unclear from the body of the document itself whether Defendant was assigning intellectual property he owned prior to his employment for Plaintiffs, Defendant signed an addendum to the

---

[1] This, and the other factual conclusions the court reaches in this order, are subject to revision based on further evidence and argument, as contemplated by the discovery, briefing and hearing schedule set in this order.

PIIA indicating the only invention or improvement relevant to the subject matter of his employment or retention that he wished to exclude from the operation of the assignment was a "carbon scrubber." ECF No. 11-1, at ECF Page No. 25. This strongly suggests that all other intellectual property Plaintiff owned which is relevant to aneroboic technology became Plaintiffs' property as a term of the parties' employment agreement.

After considering the evidence and the witnesses' testimony, the court concludes that there is evidence Defendant has breached this agreement. There is evidence, unrebutted by Defendant at the hearing, that Defendant obtained test results from Verliant's laboratory, had them sent to his personal e-mail account, and then provided them surreptitiously to his now-current employers without Plaintiffs' knowledge. See Chiu Declaration ¶ 32; see also Chiu's Testimony at Hearing.[2] There is also evidence, again unrebutted by Defendant at the hearing, that Defendant contacted Plaintiffs' clients on his own behalf while working for Plaintiffs. See Testimony at Hearing. In taking both of those actions, Defendant used Plaintiffs' "Proprietary Information," as it was defined in the PIAA, for his own personal purposes, rather than respecting Plaintiffs' contractual right to sole ownership of that information. These actions would also appear to also violate the UTSA's prohibition against the misappropriation of trade secrets. For these reasons, Plaintiffs have demonstrated that there are, at the very least, serious questions going to the merits of their claims for breach of contract and for misappropriation of trade secrets.[3]

Some aspects of Plaintiffs' proposed restraining order aim to restrain Defendant from soliciting business or competing with Plaintiffs. But it does not appear that the documents which contain those obligations – Exhibits A and C to the Chiu Declaration – were part of a legal contract agreed upon by all parties. Chiu made it plain at the hearing that Plaintiffs provided Barry with typewritten versions of Exhibits A and C, Barry then modified them by interlineation and signed them, and Plaintiffs chose not to execute the agreements as modified because they did

---

[2] The court does not yet have a transcript of today's hearing.

[3] The court does not consider Plaintiffs' other causes of action other than breach of contract and misappropriation of trade secrets, since they do not appear to give rise to any additional irreparable harm other than that already described and analyzed in this order.

not agree to the new terms. Exhibits A and C were therefore counter-offers, not binding contracts. See, e.g., Landberg v. Landberg, 24 Cal. App. 3d 742, 750 (1972) ("qualified acceptance constitutes a rejection terminating the offer; it is a new proposal or counteroffer which must be accepted by the former offeror now turned offeree before a binding contract results"). Therefore, the court concludes that Plaintiffs have not made the required showing of success on the merits of the breach of contract causes of action that arise out of those documents.

Plaintiffs have also failed to demonstrate that Barry's acceptance of employment with CAY, Ltd. or the Chinese research academy,[4] without more, violates any binding agreement or constitutes the misappropriation of trade secrets.

It seems clear that Defendant only gained his relationship with his current employers through his work for Plaintiffs, and that Defendant's current employers were Plaintiffs' prospective employers at the time Defendant decided to accept employment with them. Plaintiffs' customer lists, which included Defendant's current employers, are presumably "trade secrets."

But Plaintiffs have not demonstrated that the contracts, or the UTSA, prohibit Defendant from *accepting* employment with these entities (in fact, to the contrary, paragraph 8 of the PIIA states that he may do so). It means, at most, that he was prohibited from *using* Plaintiffs' customer lists for the purpose of seeking his own employment. Defendant testified that he did not use his contacts with his current employers to seek his current employment. He claims he was approached by those entities, and Plaintiffs have no evidence to show otherwise. The court recognizes that Plaintiffs have not yet had the opportunity to conduct discovery, but injunctive relief is an "extraordinary remedy" that cannot be justified by non-evidentiary speculation.

## II.     Likelihood of Irreparable Harm

If Defendant is permitted to disclose Defendants' proprietary information, Plaintiffs will suffer the possibly irreversible loss of trade secrets and proprietary intellectual property, and the

---

[4] The court's notes do not reflect the precise name of this entity, which will be identified in the transcript. The court uses the term "employer" to describe this entity because Barry's employment relationship involves working for the academy, although he receives his monetary compensation for that work from CAY, Ltd.

loss of significant business goodwill.  See Chiu Declaration ¶ 47.  As many courts have recognized, this type of harm is typically considered irreparable.  See Stuhlbarg, 240 F.3d at 841; W. Directories, Inc. v. Golden Guide Directories, Inc., No. 09-cv-1625-CW, 2009 WL 1625945, at *6 (N.D. Cal. June 8, 2009).

Given that Defendant appears to have used Plaintiffs' private proprietary information in the past for his own personal purposes, the court also concludes that Plaintiffs have demonstrated that it is likely he will do so again in the future if not enjoined.

However, Plaintiffs have not shown that it is likely, as opposed to merely possible, that they will suffer an irreparable injury merely from Defendant continuing business relationships with any entity with whom he had discussed Plaintiffs' information while in their employ.  See Winter, 555 U.S. at 22 ("plaintiffs seeking preliminary relief" must "demonstrate that irreparable injury is likely in the absence of an injunction," not merely probable).

### III.  Balancing of the Equities

One point at the hearing was relatively unconstested.  Defendant will suffer no harm if he is restrained from disclosing Plaintiffs' proprietary information and trade secrets, since he contends he has not done so and does not intend to do so in the future.   Given the weight of potential harm to Plaintiffs, the court concludes that the balance of equities tips sharply in Plaintiffs' favor.

### IV.  Public Interest

Defendants' arguments that the public would be harmed by injunctive relief are speculative and without foundation.  The public is interested in restraining the illegal dissemination of trade secrets and contractually protected proprietary information, as is reflected in California's statutes and common law.

### V.  Scope of Relief

Injunctive relief must tailored to eliminate the potential harm from the causes of action as to which a plaintiff has made the required showing of success on the merits.  The court will order Plaintiff enjoined from disclosing or using any of the Proprietary Information described in the PIIA, including any and all intellectual property related to anaerobic technology other than the

6

"carbon scrubber." The court will not, however, order Defendant not to do business with anyone with whom he previously discussed Plaintiffs' Proprietary Information. Plaintiffs have not demonstrated that there are serious questions going to the merits of their claim that doing so violates his contractual commitments or the UTSA. The court must assume that Defendant will comply with this court's order not to disclose or use any of Plaintiffs' proprietary information.

## VI.     Bond

The court ORDERS Plaintiffs to provide a bond in the amount of $25,000.

## VII.    Schedule

The court hereby issues an ORDER TO SHOW CAUSE whether this preliminary injunction should be dissolved or modified. The court sets that issue for hearing on September 4, 2014, at 9:00 A.M., Courtroom 9, 19th Floor, 450 Golden Gate, San Francisco. Plaintiffs shall file an opening brief no later than July 31, 2014, Defendants shall file a brief no later than August 14, 2014, and Plaintiffs shall file a reply no later than August 21, 2014.

The parties have leave to engage in discovery relevant to the propriety of continued injunctive relief. Parties are ordered to review the undersigned's standing order regarding discovery disputes. As the court indicated at the hearing, the undersigned is likely to directly handle discovery disputes in this matter directly rather than refer discovery to a magistrate judge.

## VII.    Order

1. IT IS ORDERED that Defendant CHRISTOPHER JOHN BARRY ("BARRY" or "Defendant") is hereby enjoined and restrained from:
    a. using, disclosing or transmitting for any purpose, including without limitation, the Intellectual Property assigned to VERLIANT via the Memorandum of Terms and the PIIA (Exhs. B & D to the Chiu Declaration), and any intellectual property developed at or by VERLIANT while Defendant was working with VERLIANT;
    b. using, disclosing or transmitting for any purpose any confidential or proprietary documents and/or information belonging to or concerning VERLIANT and actual or potential customers/business partners, including but not limited to the confidential information, trade secrets and commercially sensitive materials of

7

VERLIANT; and

c. soliciting, inducing, causing, or assisting any third party in soliciting, any actual or potential customers/business partners who Defendant became aware of as a result of Defendant's work with VERLIANT.

2. Specifically, BARRY shall refrain from soliciting business from any of VERLIANT's existing or prospective customers or business partners.

3. BARRY shall also refrain from possessing, copying, using, disclosing or transmitting for any purpose, (including, but not limited to solicitation of VERLIANT's existing or prospective customers or business partners), the confidential information and data contained in VERLIANT's laboratories, offices, records, files, and databases, including, without limitation, VERLIANT's intellectual property, trade secrets, and other Proprietary Information, including all tangible and intangible property regarding and associated data, research, test results, analyses, formulas, processes, and customer and business partner names, addresses, contact information and associated data and research information.

4. BARRY shall immediately return to VERLIANT all of its original records, copies, transcriptions, and computerized data in BARRY's possession, custody or control.

5. BARRY shall refrain from imitating, copying or making unauthorized use or representations of and regarding VERLIANT's trademarks, patents, and other trade secrets and Proprietary Information, including but not limited to:

a. UK Patent Publication No. GB 2460834 A, Application No. 0810527.2, entitled "A Method of and Apparatus for Converting Biowaste into Useful Commercial Products;"

b. International Publication No,. WO 2009/150455 A2, Application No. PCT /GB2009/050644 entitled "Method and Apparatus for Converting Biowaste Into Useful Commercial Products;"

c. UK Patent Application No. GB1202852.8, entitled "A Method to Improve and Accelerate the Output of Anaerobic Digestion and to Enable Feedstock Variation;"

d. All patents filed by Christopher Barry either individually or with another inventor, and all patents filed by Achor International Ltd., either individually or with another

    inventor prior to May 1, 2013;

  e. All intellectual property pertaining to any of the previously preceding intellectual property including, but not limited to, patents, copyrights, trademarks, and trade secrets.

  f. All intellectual property pertaining to the "achorlytic converter";

  g. All intellectual property, including, but not limited to patents, copyrights, trademarks, and trade secrets, pertaining to the "A Method for enabling an increase in Productivity of Anaerobic Digestion";

  h. All intellectual property pertaining to anaerobic digestion; and

  i. All research, studies, tests, prototypes, schematics, designs, plans, projections, publications, correspondence, presentations, materials, documents, descriptions, results, writings, formulae, developments, structures, pertains to the above intellectual property.

6. BARRY shall refrain from imitating, copying or making unauthorized use or representations regarding VERLIANT's products, technology and processes, including, but not limited to its "Verliant Energy Advanced Anaerobic Digestion" (VEAAD™) technology, or any other copy or colorable imitation of VERLIANT's trademarks, trade dress, patents, and trade secrets for BARRY's use in promoting or soliciting business.

7. BARRY shall refrain from engaging in any other activity constituting infringement of or damage to VERLIANT's name, trademarks, trade dress, patents, and other intellectual property, reputation or goodwill.

8. IT IS FURTHER ORDERED that Defendant is further ordered to return to VERLIANT or its counsel all records, documents and/or information in whatever form (whether original, copied, computerized or handwritten), pertaining to VERLIANT'S trade secrets and other proprietary information within twenty-four hours of notice to Defendant or his counsel of the terms of this order.

/ / /

/ / /

/ / /

**IT IS SO ORDERED.**

Dated: June 11, 2014

_____
JON S. TIGAR
United States District Judge